<u>NOT FOR PUBLICATION</u>                    (Docket Nos. 26, 27, 28, 31)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____ :
                                   :
MARY ANN GALATI,                   :
Individually and on behalf of      :
all others similarly situated,     :
                                   :
            Plaintiffs,            :    Civil No. 04-3252 (RBK)
         v.                        :    **OPINION**
                                   :
COMMERCE BANCORP, INC.,            :
et al.,                            :
                                   :
            Defendants.            :
_____ :


**KUGLER**, United States District Judge:

    This matter comes before the Court upon separate motions by
Defendant Ronald A. White, Defendants Glen K. Holck and Stephen
M. Umbrell, and Defendants George E. Norcross, III, Vernon W.
Hill, II, Commerce Bancorp, Inc., and Douglas J. Pauls to dismiss
Plaintiffs' consolidated complaint for failure to state a claim
under Federal Rule of Civil Procedure 12(b)(6). For the reasons
set forth below, Defendants' motions will be granted.

## I.   Background

    Plaintiffs bring this securities fraud class action on
behalf of all persons, excluding Defendants, who purchased the
publicly traded stock of Commerce Bancorp, Inc. ("Commerce
Bank"), during the period from June 1, 2002, through June 28,

2004. Commerce Bank is a bank holding company located in Cherry Hill, New Jersey, that operates three hundred retail bank branches in New Jersey, Pennsylvania, Delaware, and New York. Defendants include Commerce Bank and a number of directors and officers of Commerce Bank and its subsidiary Commerce Bank/Pennsylvania (collectively, "Defendants"). Plaintiffs allege that Defendants violated §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Securities Act") by failing to disclose bid-rigging and other unlawful practices committed on behalf of Commerce Bank during the relevant period.

The allegations arise out of the events surrounding the June 28, 2004, indictment of three Commerce Bank/Pennsylvania executives and directors for employing illegal practices to obtain lucrative business with the City of Philadelphia. Specifically, Ronald A. White ("White"), Glenn K. Holck ("Holck"), and Stephen M. Umbrell ("Umbrell"), in their respective capacities as Commerce Bank/Pennsylvania director, president, and regional vice-president, bestowed a number of personal benefits upon Philadelphia Treasurer Cory Kemp ("Kemp") in exchange for Kemp's influence to secure contracts and other official actions favoring Commerce Bank. Also named as Defendants are Vernon W. Hill, II ("Hill"), the Chief Executive Officer and Chairman of Commerce Bank, George E. Norcross, III ("Norcross"), the Director of Commerce Bank, Director of Commerce Bank/New

Jersey, and Chairman and Chief Executive Officer of Commerce Insurance Services, Inc., and Douglas J. Pauls ("Pauls"), the Chief Financial Officer of Commerce Bank. Plaintiffs claim that all Defendants had independent actual knowledge of the unlawful activities that gave rise to the indictment.

Plaintiffs' consolidated complaint focuses almost exclusively on the illegal interactions between Kemp, White, Holck, and Umbrell. Plaintiffs thoroughly describe the relationship between Kemp and Commerce Bank/Pennsylvania, and enumerate in great detail the numerous personal benefits that Holck, Umbrell, and White conferred on Kemp to obtain City accounts and bond deals.[1] In exchange for these favors, Kemp channeled City business to Commerce Bank, including a $1.5 million City account in May 2002, $50 million in City deposits in March 2003, priority in several City bond deals, and inside bidding assistance for a $30 million line of credit to finance activities associated with the Mayor of Philadelphia's Neighborhood Transformation Initiative. Plaintiffs also identify specific communications between Commerce Bank/Pennsylvania and

---

[1] Plaintiffs allege that Holck and Umbrell waived conditions and otherwise assisted Kemp in securing two mortgage loans in December 2002, which Kemp could not otherwise have obtained due to his poor credit and clear inability to repay, an automobile loan in March 2003, a $480,000 construction loan for a church where Kemp was a trustee in May or June 2003, and an unsecured loan for Kemp's brother-in-law. Commerce Bank also endowed Kemp with several other benefits including expensive dinners and athletic tickets. (Consol. Compl. ¶ 37-45)

Defendant Hill, which they allege put Hill on notice of these practices.

Plaintiffs claim that Defendants' illegal activities caused considerable harm to shareholders, including losses of approximately $705 million and a drop in value of 23% in the two days following disclosure of the indictment on June 28, 2004. Allegedly in response to the indictment, the value of Commerce Bank's shares dropped 23% from December 29, 2004, through July 30, 2005.

In addition to their account of Defendants' bid rigging and other unlawful activities, Plaintiffs devote a section of their complaint to enumerate their claims of "false and misleading statements [made] during the class period." These statements consist entirely of Commerce Bank quarterly earnings releases, signed and certified by Defendants Hill and Pauls, and filed with the Securities and Exchange Commission ("SEC") from August 14, 2002, through May 10, 2004. Plaintiffs allege no statements made by any Defendants other than Hill and Pauls.

Plaintiff Mary Ann Galati filed suit against Defendants on July 2, 2004. On November 23, 2004, the Honorable Joel B. Rosen ordered consolidation of her suit with a number of complaints by subsequent Plaintiffs. Plaintiffs then filed a consolidated complaint on January 24, 2005, on behalf of all individuals similarly situated, alleging that Defendants failed to disclose

4

illegal conduct in violation of §§ 10(b) and 20(a) of the Securities Act. (Consol. Compl. ¶ 4).[2] Defendants now move to dismiss the consolidated complaint for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6).

## II.   Standard

### A.   Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) should be granted only if "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." In re Rockefeller Ctr. Properties, Inc., Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002); Klein v. General Nutrition Co., 186 F.3d 338, 342 (3d Cir. 1999). A motion to dismiss "tests the legal sufficiency of the complaint." In re ATI Tech., Inc., Sec. Litig., 216 F. Supp. 2d 418, 427 (E.D. Pa. 2002) (citing Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir.1993)). "The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an

---

[2] In addition to the bid-rigging, Plaintiffs claim that Commerce Bank and Defendant Pauls, the treasurer of Commerce Bank's state and federal Political Action Committees (PACs), engaged in other "illegal, undisclosed, unsustainable activities" including numerous violations of federal election laws and elaborate schemes to launder funds to avoid limitations imposed on political contributions. However, Plaintiffs allege no misleading statements related to these practices, nor do they mention Commerce Bank's campaign contributions in their section on "False and Misleading Statements During the Class Period" (Consol. Compl. ¶ 120-123). Consequently, for the purpose of deciding Defendants' motions to dismiss, the Court will disregard these factual allegations as surplusage.

opportunity to offer evidence in support of their claims." <u>In re</u>
<u>Rockefeller</u>, 311 F.3d at 215.

Consequently, the Court must "accept all well-pleaded
allegations in the complaint as true and to draw all reasonable
inferences in favor of the non-moving party." <u>Id.</u> at 215 (citing
<u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)); <u>In re Burlington</u>
<u>Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1420 (3d Cir. 1997).
However, the court need not credit a plaintiff's "bald
assertions" or "legal conclusions draped in the guise of factual
allegations." <u>Id.</u>

**B.    Rule 9(b) and the Private Securities Litigation Reform Act**

Rule 9(b) imposes a heightened pleading requirement on
allegations of fraud, including claims brought under § 10(b) of
the Securities Act. <u>See</u> <u>In re Rockefeller</u>, 311 F.3d at 216 ("Rule
9(b)'s heightened pleading standard gives defendants notice of
the claims against them, provides an increased measure of
protection for their reputations, and reduces the number of
frivolous suits brought solely to extract settlements."). Under
Rule 9(b), plaintiffs must state with particularity "the
circumstances constituting fraud or mistake." Fed. R. Civ. P.
9(b). To satisfy the particularity requirement, the complaint
should include "all of the essential factual background that
would accompany 'the first paragraph of any newspaper story'--
that is, the 'who, what, when, where and how' of the events at

issue." Id. at 217 (quoting In re Burlington, 114 F.3d at 1422).
Boilerplate allegations are insufficient. Id.

In addition to satisfying Rule 9(b), allegations of
securities fraud must accord with the heightened pleading
requirements of the Private Securities Litigation Reform Act of
1995 (PLSRA). 15 U.S.C. § 78u-4(b)(1), (b)(2). Under the PSLRA
the complaint must "specify each statement alleged to have been
misleading [and] the reason or reasons why the statement is
misleading." In re Rockefeller, 311 F.3d at 217 ("The
particularity described in § 78u-4(b)(1) extends that of Rule
9(b) and requires plaintiffs to set forth the details of
allegedly fraudulent statements or omissions, including who was
involved, where the events took place, when the events took
place, and why any statements were misleading."). Plaintiffs
must also plead with particularity facts supporting a "strong
inference" of scienter. In re Advanta Corp. Sec. Litig., 180 F.3d
525, 530, 534 (3d Cir. 1999).

## III.      Discussion

Section 10(b) of the Securities Act makes it illegal to "use
or employ, in connection with the purchase or sale of any
security . . . , any manipulative or deceptive device or
contrivance in contravention of such rules and regulations as the
Commission may prescribe." 15 U.S.C. § 78j(b). Under 17 CFR
section 240.10b-5 ("Rule 10b-5"), it is "unlawful for any person,

directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b-5.[3]

To establish a claim for violation of Rule 10b-5, the plaintiff must allege with particularity that: (1) the defendant "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading"; (2) the "defendant acted with scienter"; and (3) the plaintiff's reliance on defendant's misstatement or omission injured the plaintiff. In re Burlington, 114 F.3d at 1417 (citing In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1243 (3rd Cir.1989)); see also In re Advanta, 180 F.3d at 537.

---

[3] Rule 10b-5 reads in its entirety:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b-5

8

## A.    Material False or Misleading Statement or Omission

Defendants argue that they are not liable under Rule 10b-5 because they neither made a misleading statement, nor had a duty to disclose the illegal conduct. Plaintiffs claim: (1) Defendants misleadingly attributed Commerce Bank's success to its unique business model and convenience when "its pattern of bribery and bid-rigging fueled the Company's results" (Pls. Opp. at 16-17); (2) Defendants' quarterly earnings release statements, including positive commentary and specific reports of government deposits, were misleading without full disclosure of the illegal practices; and (3) the failure to reveal criminal conduct is inherently misleading. As set forth more fully below, none of these allegations amounts to a materially misleading statement or omission for the purposes of Rule 10b-5.[4]

## 1.    Materiality

Regardless of its falsity, a misleading statement or omission is not actionable unless it is material. A misrepresentation "is material if there is a substantial

---

[4] Plaintiffs allege no misleading statements other than the SEC filings signed by Defendants Hill and Pauls. Because liability for violation of Rule 10b-5 rests exclusively on misleading statements and omissions, Plaintiffs have therefore failed to plead a violation by any Defendants other than Hill and Pauls. However, because this Court finds that none of the alleged statements were in fact materially misleading, the Court will dismiss the consolidated complaint in its entirety without addressing Plaintiffs' failure to plead violations by particular Defendants.

likelihood that a reasonable shareholder would consider it important in deciding how to [act]." <u>EP Medsystems, Inc. v. EchoCath, Inc.</u>, 235 F.3d 865, 872 (3d Cir. 2000) (quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976)); <u>see also</u> <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 232 (1988) (relating this standard specifically to Rule 10b-5). Omitted information is material if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." <u>Craftmatic Sec. Litig. v. Kraftsow</u>, 890 F.2d 628, 639 (3d Cir. 1989) (quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976)). While determinations of materiality are typically reserved for the trier of fact, "complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." <u>In re Burlington</u>, 114 F.3d at 1426.

The Third Circuit has consistently held that "[v]ague and general statements of optimism," known as "puffery," are not material since a reasonable investor would be unlikely to rely on them to make decisions. <u>Id.</u> Similarly, "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism" do not alter the total mix of relevant information available, and therefore are

not material. In re Advanta, 180 F.3d at 538 (quoting In re Burlington, 114 F.3d 1410, 1428 n.14). Such statements are not actionable under Rule 10b-5 as a matter of law. Id.

In support of their claim, Plaintiffs allege that Defendant Hill made remarks attributing Commerce Bank's success to its "unique business model" and "convenience." (Pls. Opp. at 16-17). Plaintiffs claim that Hill's comments were materially misleading because Commerce Bank's success was actually "fueled by repeated criminal conduct."[5] However, the context of these statements makes it clear that a reasonable investor would view them as no more than boilerplate rhetoric. Although they do not say so explicitly, Plaintiffs appear to glean these quotes from a number of quarterly earnings releases filed with the SEC during the relevant period. The allegedly misleading language is contained in several releases, which repeat: "Chairman Hill indicated 'America's Most Convenient Bank' continues to produce record results" (see earnings releases from Q3:02, Q4:02, Q1:03, Q2:03). In the same manner, several of the reports state: "Vernon W.

---

[5] These statements are buried in the consolidated complaint in four pages of dense bullet points. (Consol. Compl. ¶ 120-121). Plaintiffs do not explain in their complaint "why the statement[s] [are] misleading," In re Rockefeller, 311 F.3d at 217, nor do they make their "business model" arguments until their opposition to Defendants' motion to dismiss. Consequently, these statements likely are not pleaded with particularity sufficient to satisfy Rule 9(b) and the PLSRA. Nevertheless, because this Court now holds that these statements are immaterial, it will not reach the issues presented by Rule 9(b) and PLSRA.

11

Hill, II, Chairman, commenting on the Company's financial results said, 'in the most difficult low-rate operating environment in the last 45 years, the unique Commerce business model continues to produce strong top-line revenue growth." (See earnings releases from Q3:03, Q4:03, Q1:04).

These remarks are exactly the sort of vague, general, optimistic commentary that the Third Circuit has deemed immaterial puffery. Commerce Bank's slogan "America's Most Convenient Bank" and its claim to a "unique" business model are simply too vague and subjective to influence reasonable investors or "alter the total mix of information available." See e.g., In re Advanta, 180 F.3d at 539 (holding as immaterial optimistic statements such as "[o]ur superior cost structure for delivering and servicing financial products allows us to achieve outstanding returns with highly competitive pricing and flexibility"). Consequently, these statements are not actionable under Rule 10b-5.

In addition to Defendants' allegedly misleading comments about Commerce Bank's business model, Plaintiffs contend that Defendants' failure to disclose bid-rigging and other criminal conduct was a material omission in light of their positive earnings statements. Specifically, Plaintiffs claim that Defendants were obligated to disclose (1) "the corrupt, illegal and unsustainable means that Commerce Bank . . . was utilizing to

develop banking business with state, city and municipal authorities"; and (2) "the attendant risks that such practices were creating for the future prospects of the Company." (Consol. Compl. ¶ 48). As explained below, Defendants' illegal activities were material, but the failure to disclose "the attendant risks" of those activities was not.

Information about a corporation's illegal conduct is inherently material for the purposes of Rule 10b-5. See e.g., Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987) (holding that a company's practice of bribery is material information, even if the criminal conduct has not yet become the subject of investigation). Naturally, a reasonable investor would give considerable weight to a corporation's unlawful practices. As the First Circuit explained in the oft-cited opinion Roeder v. Alpha Industries, Inc., 814 F.2d at 26, "Management's willingness to engage in practices that probably or obviously are illegal, and its decision to put the corporation at risk by so doing, may be critically important factors to investors," particularly since "[i]nvestors may prefer to steer away from an enterprise that circumvents fair competitive bidding and opens itself to accusations of misconduct." Id.

Defendants argue that the Bank's bid-rigging practices were immaterial because they relate to a negligible portion of Commerce Bank's business and contribute only a small percentage

13

to Commerce Bank's total deposits and revenue. However, the materiality of criminal activities is unaffected by the extent of the illegal conduct; after all, "[i]llegal payments that are so small as to be relatively insignificant to the corporation's bottom line can still have vast economic implications," as they may endanger all of a corporation's business if they are discovered. Id. Furthermore, "[i]nformation about bribery is relevant to important questions about the competency of management." Id. Consequently, a corporation's unlawful practices are material, even if the practices relate to only a minor aspect or portion of the business.

However, while omissions regarding criminal conduct are material, omissions relating to "the attendant risks" or unsustainability of criminal conduct are not. Even if a corporation is engaging in illegal practices, predictions of future events such as criminal indictments are too speculative to be material. See Craftmatic, 890 F.2d at 640-41. The Third Circuit addressed precisely this point in Craftmatic when plaintiffs alleged that that the corporation's "advertising and marketing program was based on deceptive, illegal sales practices that 'would and did result in serious charges being brought against Craftmatic." The Court dismissed plaintiffs' claim, holding that the possibility of criminal charges was "sufficiently speculative and unreliable to be immaterial as a

14

matter of law." Id. at 644. The Court then employed the same
reasoning to dismiss allegations that Craftmatic's unlawful
practices created serious risks for the corporation and were "not
sustainable." Id.

Consequently, as a matter of law, the risks inherent in
Commerce Bank's unsustainable illegal practices were too
speculative to be material. Only information regarding
Defendants' illegal conduct itself is material under Rule 10b-5.

## 2.   Misleading Statement or Omission

Although Rule 10b-5 prohibits corporations from making
material misstatements of fact, corporations need not actively
disclose information--even material information--unless there
exists a "duty to speak." Chiarella v. United States, 445 U.S.
222, 235 (1980); In re Burlington, 114 F.3d at 1432 ("Except for
specific periodic reporting requirements . . . there is no
general duty on the part of a company to provide the public with
all material information."). Only misleading statements are
actionable under Rule 10b-5, and silence, "absent a duty to
disclose," is not inherently misleading. Basic, 485 U.S. at 239
n.17. Consequently, although information concerning Commerce
Bank's illegal practices was material, Defendants were
nevertheless under no obligation to reveal the information unless
they had a preexisting duty to do so.

In circumstances where there is no insider trading or

statute requiring disclosure, a duty to disclose likely exists only in the presence of "an inaccurate, incomplete or misleading prior disclosure." Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000); In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 583 (D.N.J. 2001) (holding that once a corporation has chosen to make a disclosure, "the disclosing party has an obligation to ensure that the representations are accurate") (citing Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1098 n.7 (1991)). Consequently, Defendants are liable under Rule 10b-5 for failure to disclose their illegal practices only if Plaintiffs can point to a statement that was rendered inaccurate or misleading by the omission.

For the purposes of Rule 10b-5, "[a] statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it." In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 573 (D.N.J. 2001). A statement is also misleading if "when viewed in the light of the circumstances under which it was made, [it] presented a false report of the facts." Jaroslawicz v. Engelhard, Corp., 704 F. Supp. 1296, 1306 (D.N.J. 1989) (citing Associated Builders, Inc. v. Alabama Power Co., 505 F.2d 97, 101 (5th Cir. 1974).

Plaintiffs allege that Defendants' "positive statements about growth in Commerce Bank's government and public deposits" and "positive statements about growth in Commerce Bank's

16

investment banking fees at Commerce Capital Markets" created a
duty to tell the "whole truth" about Defendants' illegal
activities. (Consol. Compl. ¶ 122). In support of this claim,
Plaintiffs list a number of excerpts from Commerce Bank's
quarterly filings with the SEC. (Consol. Compl. ¶ 120-121). These
filings are composed primarily of empirical listings of Commerce
Bank's deposits, revenue, and percentages of growth. Accompanying
these financial performance figures are self-congratulatory
comments such as "dramatic deposit growth," "record growth,"
"record deposits growth," and "strong top-line revenue growth"
(Pls. Opp. at 15). Plaintiffs allege that these positive reports
were misleading without the disclosure of Defendants' criminal
conduct.

     However, as long as they are accurate, earnings statements
themselves do not create liability under Rule 10b-5. See e.g., In
re ATI Technologies, Inc. Sec. Litig., 216 F. Supp. 2d 418, 433
(E.D. Pa. 2002) (holding that "ATI's announcements of its
quarterly and yearly earnings, gross margins, sales, etc., were
not material misrepresentations"). To hold otherwise would be to
establish per se liability under Rule 10b-5 for any material
information related to corporate earnings releases--a result that
would be almost indistinguishable from creating a general duty of
disclosure.

     The Third Circuit has made it clear that corporations are

17

not liable merely for reporting past successes. See e.g., In re
Advanta, 180 F.3d at 538 ("Factual recitations of past earnings,
so long as they are accurate, do not create liability under
Section 10(b)); In re Burlington, 114 F.3d at 1432 ("Equally well
settled is the principle that an accurate report of past
successes does not contain an implicit representation that the
trend is going to continue, and hence does not, in and of itself,
obligate the company to update the public as to the state of the
quarter in progress."). Statements claiming deposit growth of 48%
or total revenues of "$8.1 million for the second quarter of 2002
compared to compared to $5.3 million for the second quarter of
2002, a 54% increase," (Consol. Compl. ¶ 121), state nothing more
than empirical facts. So long as those numbers are accurate, they
cannot create Rule 10b-5 liability.

Nor are Defendants liable for vague positive remarks
accompanying earning releases. In Advanta, plaintiffs claimed
that a number of statements in letters to shareholders, annual
reports, and other publications were misleading in light of the
corporation's questionable business techniques and the
deterioration in credit quality attributable its "aggressive
efforts to attract new customers." In re Advanta, 180 F.3d at
538. However, in examining the allegedly misleading statements,
the Third Circuit found that each statement was non-actionable as
either an accurate report of past earnings or an expression of

18

optimism.[6]

Plaintiffs' argument that the failure to reveal criminal conduct is per se misleading is also without merit. Plaintiffs cite In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 381-82 (S.D.N.Y. 2003), for the proposition that concealing illegal activity is inherently misleading. However, In re Initial Public Offering addressed market manipulation, holding only that "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b-5(a) or (c), that misconduct creates an independent duty to disclose." Id.

Although there is no Third Circuit case directly addressing a corporation's obligation to disclose criminal conduct, the First Circuit held in Roeder that the defendant corporation's

_____

[6] These statements include, "Advanta's credit quality continues to be among the best in the industry. Our emphasis on gold cards--and targeting of high quality customer prospects with great potential for profitability--sets us apart from other credit card issuers"; "The Company is among the most efficient producers in the credit card industry. Our superior cost structure for delivering and servicing financial products allows us to achieve outstanding returns with highly competitive pricing and flexibility"; "Our emphasis on gold cards--and targeting of better quality customers--helps us maintain an enviable credit quality profile. Gold cards made up 82% of our credit card balances in 1995, nearly double the industry average"; "Despite industry-wide pressure on credit card asset quality, Advanta continued to produce better-than-industry credit measures, and achieved excellent growth and returns throughout our core businesses"; "The Company's credit card asset quality statistics continue to be better than industry averages"; and touting of Advanta's strengths, including "an experienced management team, technological expertise . . . and expanding distribution channels." In re Advanta, 180 F.3d at 539.

failure to disclose its practice of paying bribes to obtain subcontracts was not inherently misleading. <u>Roeder</u>, 814 F.2d at 22. Additionally, the Third Circuit has observed that "the nondisclosure of a statutory violation *may* be an omission of information necessary to make other statements not misleading," suggesting that the failure to disclose criminal conduct is not necessarily misleading in itself. <u>Craftmatic</u>, 890 F.2d at 640 (emphasis added).

Furthermore, "the private cause of action under § 10(b) and Rule 10b-5 is designed to implement the Congressional intent to regulate securities transactions." <u>Straub v. Vaisman & Co., Inc.</u>, 540 F.2d 591, 599 (3d Cir. 1976). Rule 10b-5 was not intended to provide shareholders with an avenue for relief against executives for alleged illegal practices or corporate mismanagement. <u>See e.g.</u>, <u>In re Citigroup, Inc., Sec. Litig.</u>, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ("The securities laws were not designed to provide an umbrella cause of action for the review of management practices."). Consequently, the illegality of Defendants' conduct does not establish a Rule 10b-5 violation unless Defendants made a misleading statement in conjunction with the conduct.

As Plaintiffs have failed to specify any material misstatement or omission sufficient to establish liability under Rule 10b-5, Plaintiffs' allegations under Rule 10b-5 must be

20

dismissed.[7]

**B.    Control Person Liability**

In addition to their claims under Rule 10b-5, Plaintiffs allege that Defendants are liable under § 20(a) of the Securities Act. Section 20(a) provides for derivative liability of "control persons" in the event of a violation of the Securities Act. 15 U.S.C. § 78t. A cause of action for control person liability requires plaintiffs to establish: "(1) an underlying violation by a controlling person or entity; (2) that the defendants are 'controlling persons;' and (3) that the defendants were in some meaningful sense culpable participants in the fraud." In re Digital Island Sec. Litig., 223 F. Supp. 2d 546, 560 (D. Del. 2002) (quoting In re Party City Sec. Litig., 147 F. Supp. 2d 282, 317 (D.N.J. 2001)).

Where plaintiffs cannot establish "an underlying violation" of the Securities Act, a § 20(a) claim must be dismissed since "[l]iability under section 20(a) is predicated upon an independent violation of 'this chapter or the rules or regulations thereunder.'" In re Advanta, 180 F.3d at 541 (quoting 15 U.S.C. § 78t); see also Greebel v. FTP Software, Inc., 194 F.3d 185, 207 (1st Cir. 1999) (holding that absent an underlying

---

[7] Because this Court now finds that Plaintiffs alleged no statement or omission sufficient to create liability under Rule 10b-5, the Court will not reach Defendants' arguments regarding scienter, reliance, or causation.

violation of the securities laws, a § 20(a) claim cannot stand).

Accordingly, because this Court now finds that Plaintiffs have not stated a claim under Rule 10b-5, Plaintiffs allegations of control person liability under § 20(a) must be dismissed for lack of an underlying violation of the Securities Act.

The accompanying Order shall issue today.


Dated: __11-7-05_____        S/ Robert B. Kugler_____
                                  ROBERT B. KUGLER
                                  United States District Judge


22